# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RONALD P. JOHNSON, Administrator )
of the Estate of JAMES R. BULLOCK, Jr., )
Deceased, )
                                      )
       Plaintiff, )
                                      )               No. 18 C 6235
      v. )
                                        )              Judge Jorge L. Alonso
JET SUPPORT SERVICES, INC., )
                                        )
       Defendant. )

## MEMORANDUM OPINION AND ORDER

James R. Bullock, Jr. ("Bullock") was surprised to learn he would have to pay himself to

overhaul the engines on his newly-purchased private jet. The executor of his estate filed against

defendant Jet Support Services, Inc. ("JSSI") a three-count complaint alleging breach of contract,

promissory estoppel and unjust enrichment.[1] Defendant moves to dismiss. For the reasons set

forth below, the Court grants the motion to dismiss.

---

[1] The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff Ronald
P. Johnson is the administrator for the estate of James R. Bullock, who was a citizen of North
Carolina. (Complt. ¶ 1, 9). Thus, plaintiff is a citizen of North Carolina. 28 U.S.C. §
1332(c)(2). Defendant is a Delaware corporation with a principal place of business in Illinois.
(Complt. ¶ 2). Thus, defendant is a citizen of Delaware and Illinois. 28 U.S.C. § 1332(c)(1).
The amount in controversy exceeds $75,000.00.

I.      **BACKGROUND**

The following facts are from plaintiff's[2] complaint, and the Court takes them as true.

As of January 1, 2016, a company in France, Gadinair, owned a Cessna 560 Excel Jet (the "jet") that it wished to sell. It hired Bell Aviation to serve as its listing agent for the jet. Bell Aviation employed Charley Lloyd ("Lloyd"), who assisted with the sale.

In early January 2016, plaintiff received from Bell Aviation a flyer about Gadinair's jet. Plaintiff, who had sold his Cessna the year before, telephoned Lloyd, the listing agent, to discuss the jet. Lloyd sent plaintiff some photos attached to an email which said, among other things:

> The Paris Citation Service Center has completed the 1-5 inspections and the engines have approximately 54% coverage on JSSI.

(Complt. Exh. D).

*JSSI*

Defendant JSSI is a company that offers maintenance programs for aircraft. On or about February 27, 2012, JSSI and Gadinair entered into a contract for a maintenance program on the jet (the "2/27/2012 Maintenance Agreement"). The 2/27/2012 Maintenance Agreement states, in relevant part:

RECITALS:

> A.      JSSI is in the business of providing programs for the repair and maintenance of turbine engines as described in this Contract (the "Program"). All capitalized terms used herein, and not defined herein, shall have the meanings ascribed to them in <u>Exhibit A</u> attached hereto and made a part hereof.

> B.      The Client desires to obtain the benefits of the Program, and JSSI desires to provide the Program to the Client, subject to the terms and conditions of this Contract.

---

[2] The parties refer to Bullock, who passed away September 1, 2017, and to the administrator of his estate, collectively, as "plaintiff." The Court will do the same. The facts relevant to plaintiff's claims occurred before Bullock's death.

The parties agree as follows:

\*   \*   \*

## III.   TRANSFER, TERMINATION AND CONTINUATION OF SERVICE

(a)  Term; Renewal Contract.  The initial term of this Contract is sixty (60) months.  Except in accord with the specific provisions of this Section III, this Contract is non-cancelable by either party.  At the conclusion of each sixty (60) month period, a renewal contract subject to the then current JSSI terms and conditions may be issued to the Client as mutually agreed by the parties, with such agreement not to be unreasonably withheld, conditioned, or delayed.  At the time of issuance of such renewal contract the Client must be in compliance with all terms and conditions of this Contract, including, but not limited to, payment of Minimum Service Charges.  The beginning Account Balance under such renewal contract shall be equal to the amount of the Account Balance at the conclusion of this Contract, calculated as described in Exhibit A.

(b)  Transfer of Aircraft to Affiliate.  In the event the Client determines to transfer the aircraft to an Affiliate during the term of the Contract, the Client shall provide written notice to JSSI at least ten (10) days prior to the date of such transfer.  . . .  If the Client is in full compliance with the terms and conditions of this Contract at the time of the proposed assignment, and the Affiliate's creditworthiness is acceptable to JSSI, then JSSI, the Client, and the Affiliate shall take all necessary steps to arrange for the assignment and assumption of all rights and obligations of Client under this Contract to such Affiliate.  . . .

(c)  Sale of Aircraft:  New Contract with Purchaser.  In the event the client determines to sell the Aircraft during the term of this Contract, the Client shall provide written notice to JSSI at least ten (10) days prior to the date of closing of such sale.  Such notice shall include the name and address of the Purchaser, the estimated closing date, and any other information reasonably requested by JSSI. If the Client is in full compliance with the terms and conditions of this Contract at the time of sale, the Purchaser's creditworthiness is acceptable to JSSI, and the Purchaser desires to maintain enrollment in the Program, JSSI and the Client shall take all necessary steps to arrange for the execution and delivery of a new contract between JSSI and the Purchaser, subject to the then current JSSI terms and conditions.  Such new contract shall be entered into on or before the closing date of such sale.  The beginning Account Balance under such new contract shall be equal to the amount of the Account Balance at the conclusion of this Contract, calculated as described in Exhibit A.  In addition, this Contract shall be terminated, and neither JSSI nor the Client shall have any further obligations under this Contract, effective as of the date JSSI and the Purchaser enter into the new contract.

(d)  <u>Sale of the Aircraft; Termination of Contract</u>.  In the event of a sale of the Aircraft to a Purchaser (which Purchaser shall not be an Affiliate of the Client) not desiring to participate in the Program, JSSI shall consent to termination of this Contract with the Client under the following terms:

> (i)  The receipt by JSSI of any data and documents reasonably requested by JSSI . . .
> (ii)  Full payment of all amounts due . . .
> (iii)  Receipt by JSSI of evidence satisfactory to JSSI of the sale of the Aircraft; and
> (iv)  Return of all equipment on loan to the Client hereunder.

(e)  <u>Early Termination; Certain Circumstances</u>.  In the event the Aircraft is damaged beyond economical repair or becomes unrecoverable because of theft . . .  The liability of the parties in further performance of this Contract shall be terminated effective as of the date of such damage or theft.

\* \* \*

(j)  <u>Credit Towards Replacement Aircraft.</u>  In the event (A) the Client sells the Aircraft and the Purchaser does not wish to enroll in the Program (as provided in <u>Subsection III(d)</u> above), or (B) this Contract is terminated because of damage or theft of the Aircraft (as provided in <u>Subsection III(e)</u> above), the Client shall have the rights set forth in this <u>Subsection III(j)</u>.  If the Client elects to enroll a Replacement Aircraft in the Program and enter into a new contract covering such replacement Aircraft, the Client shall be eligible to apply the amount of its Credit under this Contract, calculated as described in <u>Exhibit A,</u> against either (1) the amount of the Pro Rata Elimination Fee, if any, due under the new contract for the Replacement Aircraft if the Replacement Aircraft is an In-Service Aircraft; or (2) the amount of monthly flight hour payments due under such new contract if the Replacement Aircraft is a New Aircraft.  The Client's rights under this <u>Subsection III(j)</u> shall expire in the event that the Client does not enter into a new contract for a Replacement Aircraft within thirty-six (36) months from the date of the termination of this Contract pursuant to either <u>Subsection III(d)</u> or <u>(e)</u>, as applicable.

(k)  <u>Early Termination; Rebate of Account Balance.</u>  In the event that (i) the Client is the first party to enroll the Engine(s) on a JSSI program, (ii) the Client is in compliance with all terms and conditions of this Contract, including, but not limited to, payment of Minimum Service Charges, and (iii) an off-wing event has not yet been performed on the Engine under this Contract, the Client shall have the right to terminate this Contract by delivering written notice thereof to JSSI and the liability of the parties in further performance of this Contract shall be terminated effective as of the date of JSSI's receipt of such notice.  In addition, within ninety (90) days of the effective date of such termination notice, JSSI shall pay to the Client an amount equal to seventy percent (70%) of the Account Balance, calculated as described in <u>Exhibit A</u>, as of the effective date of such termination.

## IV.  FEES AND OTHER CHARGES.
\*   \*   \*

(b) Monthly Payment.  Each month during the term of this Contract, the Client shall make a monthly payment based upon an established Hourly Rate and the Flight Hours logged during the month, as well as an Administrative Fee, if applicable.

Not later than ten (10) days after the end of each month, the Client shall submit a report on-line using the JSSI website, providing accurate operational information including the Aircraft total time and landings and Engine Operating Time and cycles for each Engine . . .
\*   \*   \*

(i) Transfer Fees.  In the event of a sale of the Aircraft, as described in Subsection III(c), which results in the execution of a new contract with the Purchaser, a Transfer Fee shall be due and payable to JSSI as set forth on Exhibit B.
\*   \*   \*

## V.  GENERAL PROVISIONS.
\*   \*   \*

(c) Governing Law.  This Contract shall be governed by, and construed in accord with, the laws of the State of Illinois.
\*   \*   \*

(g) Binding Effect; Assignment.  This Contract shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  This Contract may not be assigned by the Client without the prior written consent of JSSI.  JSSI shall be entitled to assign some or all of its rights and remedies hereunder without notice or prior consent of Client.
\*   \*   \*

## EXHIBIT A
### DEFINED TERMS
\*   \*   \*

2.  ACCOUNT BALANCE means the aggregate amount of payments to JSSI by the Client hereunder less the aggregate amount distributed as Management Fees, times not less than 75%, less the aggregate amount distributed for all maintenance and repair covered hereunder with the exception of Unscheduled Maintenance, less expenses specifically permitted under the Trust Agreement and allocated to this Contract, less Federal and State Income and other taxes allocated to this Contract, all in accord with the Trust Agreement, as determined by JSSI in its reasonable discretion from time to time.  For the purposes of an On Condition Program, the aggregate amount distributed for Unscheduled Maintenance shall mean the aggregate amount distributed for Unanticipated Failure(s).
\*   \*   \*

29.  CREDIT means the aggregate amount of payments to JSSI by the Client hereunder less the aggregate amount distributed as Management Fees, times not

less than 75%, <u>less</u> the aggregate amount distributed for all maintenance and repair hereunder with the exception of Unscheduled Maintenance, <u>less</u> expenses specifically permitted under the Trust Agreement and allocated to this Contract, <u>less</u> Federal and State income and other taxes allocated to this Contract, all in accord with the Trust Agreement, as determined by JSSI in its reasonable discretion from time to time. For the purposes of an On Condition Program, the aggregate amount distributed for Unscheduled Maintenance shall mean the aggregate amount distributed for Unanticipated Failure(s).

(Complt. Exh. C at 1, 8-10, 12-13, 15, 16, Exh. A/Docket 1-3 at 5, 12-14, 16-17, 19, 20, 23-24).

Exhibit B lists an hourly rate of $197.06 per engine and a transfer fee of $2,500.00. (Complt. Exh. C at Exh. B/Docket 1-3 at 29).

*Negotiation for the sale of the jet from Gadinair to plaintiff*

When Lloyd and Bell Aviation began marketing the jet on behalf of Gadinair, the engines on the jet had been operated for 4,780 hours, which is to say roughly 95% of each engine's 5,000-hour useful life. When a jet engine reaches 5,000 hours, it must be completely overhauled. Naturally, plaintiff was not interested in paying full price for a jet in need of expensive engine overhauls. Thus, when plaintiff made an offer, he conditioned it on Gadinair's overhauling the engines. Specifically, on or about January 12, 2016, plaintiff offered to purchase the jet for $3,600,000.00, subject to: (1) the engines being overhauled at Gadinair's expense; and (2) "all airframe and engine maintenance programs (including JSSI) in effect and assignable shall be fully paid up to delivery and assigned to the Purchaser at closing with Purchaser responsible for any transfer fees." (Complt. ¶ 28).

On January 14, 2016, plaintiff learned that Gadinair had declined. Lloyd told plaintiff Gadinair was not willing to pay to overhaul the engines, because it had been paying into a JSSI maintenance program, which would cover a portion of the cost of overhauling the engines. Lloyd also told plaintiff that Gadinair was unwilling to wait to sell the jet until after the engines

had been overhauled.  Plaintiff told Lloyd he was no longer interested in the jet, but rare is the commissioned sales agent who lets a potential deal fall apart so easily.

Lloyd suggested to plaintiff that he make an offer that involved doing the engine overhauls himself using JSSI money.  Lloyd told plaintiff that JSSI would pay for about half of the overhaul for each of the two engines on the jet.  Lloyd told plaintiff the total cost of overhauling each engine would be about $1,000,000.00.  Plaintiff alleges that Lloyd had contacted JSSI and told them plaintiff was considering making an offer for the jet contingent upon being able to use funds from JSSI for the engine overhaul.

On January 15, 2016, plaintiff made a second offer for Gadinair's jet.  This time, plaintiff offered $2,500,000.00, contingent upon "all airframe and engine maintenance programs (including JSSI) in effect and assignable [being] fully paid up to delivery and assigned to the Purchaser at closing with Purchaser responsible for any transfer fees."  (Complt. ¶ 44).  Gadinair accepted.

On January 19, 2016, Lloyd sent plaintiff an email, which said, in relevant part:

Jim,

Here is the estimate for your portion of the engine overhaul from JSSI—See text below.  Tim Ferrel is saying $500,000 per side . . .

The JSSI Pro Rata is $55% (Client/you) and 45% JSSI.  So JSSI picks up 45% of the bill.  . . .

Phillip Dickerson is the JSSI Territory Manager for you and he can answer any questions you may have.  His number is 708-[xxx-xxxx].  Email is [xxx]@jetsupport.com.  If you would like me to communicate directly with Phillip, I will be happy to do so.

Charley

Charley,

Here [sic] the statement for Tim Ferrel JSSI's Sr Dtor Client Services.

Ronnie

I've researched the history on these engines and it appears that the Stage 1 HT Blades and Fuel Control (HMU) are original to each engine. As such, we should anticipate replacement of the blades and a full blown overhaul of the HMU. These are significant additional costs to a base overhaul and could drive these overhauls into the high end of the price range. I recommend you budget about $500k per engine based on the contractual pro rates.

These numbers are meant for budgetary purposes only. As with any engine, material requirements cannot be accurately estimated until the parts have been through detailed inspection.

(Complt. Exh. I).

On or about January 25, 2016, Gadinair and plaintiff signed an aircraft purchase agreement. The agreement stated, among other things:

All airframe and engine maintenance programs applicable to the Aircraft (including JSSI) that are still in effect and that by their terms are assignable shall be assigned to the Purchaser at closing and shall be fully paid up to and current as of the date of delivery. Purchaser shall be responsible for any applicable transfer fees.

(Complt. Exh. B at 5/Docket 1-2 at 6).

Plaintiff alleges that Lloyd contacted JSSI to let it know about the sale of the jet. On April 7, 2016, Lloyd told plaintiff he was filling out a transfer form for JSSI. Lloyd asked what address to use on the form. Plaintiff attached to his complaint a "JSSI Notification of Aircraft Sale" form (the "Notification Form") that seems to have been signed by Gadinair. (Complt. Exh. K). The Notification Form says, among other things:

Reference is made to that certain JSSI [TYPE] Maintenance Program Contract #JSSI0004059 (the "Contract") dated as of February 27th, 2012, between Gadinair S.a.r.L (the "Client") and JET SUPPORT SERVICES, INC. ("JSSI"). Any capitalized term used in this Notification of Aircraft Sale (this "Notification") but not defined in this Notification shall have the meaning ascribed to it in the Contract. This Notification does not amend or modify the Contract.

(Complt. Exh. K).  The Notification Form goes on to say:

> If the Aircraft was sold with the JSSI Program, the Client's right under the Contract will terminate effective as of the date of sale of the Aircraft, and JSSI will work with the Purchaser to transfer the JSSI Program coverage, which coverage will be subject to JSSI's then-current terms and conditions.
>
> If the Aircraft was sold without the JSSI Program, the Client will retain a Credit right, if applicable, to be used towards a Replacement Aircraft as set forth in the Contract.

(Complt. Exh. K).  The Notification Form contains boxes that could be checked to indicate whether the plane was sold with or without the JSSI program, and the box for sold "with" the program is checked.  The form is not dated.

The sale of the jet closed on April 18, 2016.  Prior to the closing date, JSSI did not contact plaintiff to arrange for a new contract with JSSI.  At some point (and it is not clear from the complaint when), JSSI required Gadinair to pay an arrearage of $300,000.00 to JSSI.

On May 3, 2016, plaintiff's pilot emailed JSSI to inquire how "to transfer over the JSSI program to us as new owners."  (Complt. ¶ 78).  The same day, in response, a JSSI employee wrote to the pilot, "I will provide you . . . with the transfer application to proceed with the transfer process.  I will also provide a proposal describing the engine program and the rate."  (Complt. ¶ 79).  The next day, the JSSI employee sent the pilot "a JSSI Transfer Proposal along with a Contract Application for your completion."  (Complt. ¶ 80).  It is not clear what, if anything, plaintiff did with those documents.  In late June, the pilot contacted JSSI again.  A JSSI employee told the pilot that Gadinair's maintenance program was "'paid up' for approximately 50% coverage of the engine overhauls" but that, in order to access the funds, plaintiff would need to enter a five-year maintenance agreement.

This was the first plaintiff or the pilot had heard of the requirement of signing a new contract with JSSI in order to take advantage of the Account Balance under the 2/27/2012

Maintenance Agreement.  Plaintiff was not pleased.  He contacted Lloyd (Gadinair's agent for selling the plane) and, on July 6, 2016, had a telephone call with Lloyd and an employee of JSSI. On the call, plaintiff stated, among other things, that he had not been told that he would need to sign a five-year contract with JSSI and that, because he was using the jet for personal use, he (unlike a corporation) had no need to spread the cost of future maintenance over time.  After the call, plaintiff made three more attempts to reach Lloyd.  The seller's agent never called plaintiff back, and plaintiff did not sign a new five-year maintenance agreement with JSSI.

On or about August 15, 2016, plaintiff sent the jet to South Carolina so that the engines could be overhauled.  Plaintiff paid $1,903.972.69 for the overhauls, which were completed by December 30, 2016.

Based on these allegations, plaintiff filed a three-count complaint, in which he asserts claims for breach of contract, promissory estoppel and unjust enrichment.  Defendant moves to dismiss.

## II.    STANDARD ON A MOTION TO DISMISS

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice.  *Twombly*, 550 U.S. at 555.  To survive a motion to dismiss, a claim must be plausible. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Allegations that are as consistent with lawful conduct as

they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In considering a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws permissible inferences in favor of the plaintiff. *Boucher v. Finance Syst. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). Conclusory allegations "are not entitled to be assumed true," nor are legal conclusions. *Iqbal*, 556 U.S. at 680 & 681 (noting that a "legal conclusion" was "not entitled to the assumption of truth[;]" and rejecting, as conclusory, allegations that "'petitioners 'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions of confinement"). The notice-pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-679.

On a motion to dismiss, the Court does not consider matters outside the pleadings. Fed.R.Civ.P. 12(d). The pleadings include any "written instrument that is an exhibit to a pleading." Fed.R.Civ.P. 10(c). Where a plaintiff alleges a breach of contract, a district court "may determine [the contract's] meaning as a matter of law" if "the contract is unambiguous." *McWane, Inc. v. Crow Chi. Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000). An "unambiguous contract controls over contrary allegations in the plaintiff's complaint." *McWane*, 224 F.3d at 584.

## III. DISCUSSION

### A. Breach of contract

In Count I, plaintiff asserts a claim for breach of the 2/27/2012 Maintenance Agreement between Gadinair and JSSI.

Defendant moves to dismiss plaintiff's breach of contract claim on the grounds that the contract could not be assigned without JSSI's written consent and that plaintiff has not alleged JSSI consented. Defendant is, of course, correct that the contract, by its terms, could not be assigned without JSSI's written consent. (2/27/2012 Maintenance Agreement at 16/Docket 1-3 at 20) ("This Contract may not be assigned by the Client without the prior written consent of JSSI.").

Plaintiff argues that the anti-assignment provision is unenforceable, but the Court disagrees. As plaintiff points out, under Illinois law, an anti-assignment provision in a contract does not prevent a person who has suffered either a loss under a policy or a breach of contract from assigning the right to sue on the loss or the breach. *Ginsburg v. Bull Dog Auto Fire Ins. Assoc. of Chi.*, 328 Ill. 571, 573-74 (Ill. 1928). Once the loss or breach occurs, "it becomes a chose in action, which is assignable[.]" *Ginsburg*, 328 Ill. at 573; *see also State St. Furniture Co. v. Armour & Co.*, 345 Ill. 160, 162 (Ill. 1931) ("the right of the employee to those wages is a chose in action and as such may be assigned"); *Illinois Tool Works, Inc. v. Commerce and Industry Ins. Co.*, 962 N.E.2d 1042, 1053 (Ill.App.Ct. 1st Dist. 2011) ("Once a covered loss has occurred, the insured's assignment of its right to liability coverage or a defense relating to those losses does not require consent from the insurer because the assignment is essentially the assignment of payment of a claim already accrued[.]"). The Seventh Circuit has provided this analogy:

> [I]f a contract between Placido Domingo and the Lyric Opera contains an anti-assignment clause, and Domingo decides that he is too pooped to participate, he can't send Neil Shicoff in his stead . . . But if Domingo sings, and the opera does not pay, he can transfer to Shicoff (or anyone else) the right to collect.

*Mutual Assignment and Indemnification Co. v. Lind-Waldock & Co., LLC*, 364 F.3d 858, 861 (7th Cir. 2004). But while one can assign a chose in action after a breach or a loss has occurred,

that does not mean one can ignore an anti-assignment provision and assign the contract without

consent *before* the breach occurred. *Lain v. Metropolitan Life Ins. Co.*, 388 Ill. 576, 578 (Ill.

1944) ("The general rule, supported by a great wealth of authority is that general stipulations in

policies, prohibiting assignment thereof except with the insurer's consent, or upon giving some

notice, or like conditions, have universally been held to apply only to assignments before

loss[.]").  As the Illinois Supreme Court has explained:

> [Defendant argues] that no interest under the policy could be acquired by plaintiff
> . . . except in the manner provided in the policy.  These contentions would
> probably be true if plaintiff . . . had bought the automobile covered by the policy
> prior to the time it was stolen and an attempt had been made to assign the policy.
> It would then have been necessary to comply with the provisions of the policy
> with reference to assignment, and if those provisions were not complied with
> plaintiff . . . would not be protected.

*Ginsburg*, 328 Ill. at 575.

In this case, plaintiff is not alleging that Gadinair assigned to plaintiff Gadinair's chose in

action for breach of contract against JSSI.  Plaintiff does not allege that JSSI breached its

contract with Gadinair and that, after the breach, Gadinair then assigned to plaintiff its right to

sue for that breach.  Specifically, plaintiff does not allege that Gadinair overhauled the engines

on the jet and then, only after JSSI breached the 2/27/2012 Maintenance Agreement by not

paying its pro rata share of Gadinair's overhaul expenses, assigned to plaintiff its right to sue on

the breach.  Rather, plaintiff specifically alleges that Gadinair was unwilling to overhaul the

engines before a sale.  (Complt. ¶ 31).  Plaintiff alleges "[i]n connection with the sale of the

Aircraft to Plaintiff, Gadinair assigned its rights and interests in the JSSI Maintenance Program

to Plaintiff."  (Complt. ¶ 108).  That sale closed in April 2016.  (Complt. ¶ 63).  Plaintiff goes on

to allege that "[b]ecause Defendant JSSI refused to transfer to Plaintiff the remaining benefits of

the JSSI Maintenance Program, including the Trust Funds that were dedicated for the engine

overhauls, Plaintiff was forced to complete the engine overhauls himself, for which he paid at least $1,903,972.69." (Complt. ¶ 105). Specifically, plaintiff alleges that roughly *four months after the closing*, plaintiff delivered the jet for engine overhaul (Complt. ¶ 92), which was finished in December 2016 (Complt. ¶ 105). Plaintiff alleges that "JSSI's refusal to reimburse Plaintiff" for its pro rata portion of the overhauls "constitute[s] material breach" of the 2/27/2012 Maintenance Agreement. (Complt. ¶ 114). Thus, it is clear from plaintiff's complaint that he does *not* allege that Gadinair assigned him Gadinair's chose in action for a breach of contract that occurred before any assignment. Rather, plaintiff's complaint alleges Gadinair assigned the 2/27/2012 Maintenance Agreement to plaintiff *before* JSSI's alleged breach.

Accordingly, plaintiff's claim runs headlong into the anti-assignment provision and the transfer provisions of the 2/27/2012 Maintenance Agreement. The 2/27/2012 Maintenance Agreement sets out one scenario in which JSSI agreed to allow assignment. Specifically, Section III(b) states that "[i]n the event the Client determines to transfer the Aircraft to an affiliate during the term of this Contract . . . then JSSI, the Client, and the Affiliate shall take all necessary steps to arrange for the assignment and assumption of all rights and obligations of Client under this Contract to such affiliate." (2/27/2012 Maintenance Agreement at 9/Docket 1-3 at 13). Plaintiff, though, has not alleged that he was an affiliate of Gadinair, so Section III(b) does not apply.

Other provisions applied if Gadinair planned to sell the jet to a non-affiliate. First, if Gadinair sold to a non-affiliate who wanted to participate in a JSSI maintenance program, then Section III(C) applied. That section provided:

> (c) Sale of Aircraft: New Contract with Purchaser. *In the event the client determines to sell the Aircraft during the term of this Contract*, the Client shall provide written notice to JSSI at least ten (10) days prior to the date of closing of such sale. Such notice shall include the name and address of the Purchaser, the estimated closing date, and any other information reasonably requested by JSSI. If the Client is in full compliance with the terms and conditions of this Contract at

14

the time of sale, the Purchaser's creditworthiness is acceptable to JSSI, *and the Purchaser desires to maintain enrollment in the Program, JSSI and the Client shall take all necessary steps to arrange for the execution and delivery of a new contract between JSSI and the Purchaser, subject to the then current JSSI terms and conditions.* Such new contract shall be entered into on or before the closing date of such sale. *The beginning Account Balance under such new contract shall be equal to the amount of the Account Balance at the conclusion of this Contract, calculated as described in Exhibit A.* In addition, this Contract shall be terminated, and neither JSSI nor the Client shall have any further obligations under the Contract.

(2/27/2012 Maintenance Agreement at 9/Docket 1-3 at 13) (emphasis added). Thus, the

2/27/2012 Maintenance Agreement provides a method by which plaintiff, as purchaser of the jet

from Gadinair, could take advantage of Gadinair's Account Balance. Specifically, if plaintiff

executed a new contract with JSSI, then "the Account Balance under such new contract [would]

be equal to the amount of the Account Balance at the conclusion" of the 2/27/2012 Maintenance

Agreement. Plaintiff, however, has not alleged that he signed a new agreement with JSSI (in

fact, he alleged that he had no use for such an agreement, Complt. ¶ 90), so, plaintiff has not

alleged that defendant breached Section III(c).

Plaintiff seems to agree that he has no rights under Section III(c) and seems to rely on

Section III(d) instead. (Docket 12 at 12) ("Section III(d), not Section III(c) governs the precise

factual situation alleged in the Complaint: the sale of the Aircraft by Gadinair to a new buyer not

desiring to participate in the Program."). Section III(d) provides:

(d) Sale of the Aircraft; Termination of Contract. In the event of a sale of the Aircraft to a Purchaser (which Purchaser shall not be an Affiliate of the Client) not desiring to participate in the Program, JSSI shall consent to termination of this Contract with the Client under the following terms:

(i) The receipt by JSSI of any data and documents reasonably requested by JSSI . . .
(ii) Full payment of all amounts due . . .
(iii) Receipt by JSSI of evidence satisfactory to JSSI of the sale of the Aircraft; and
(iv) Return of all equipment on loan to the Client hereunder.

(2/27/2012 Maintenance Agreement at 10/Docket 1-3 at 14).  It is clear this section gives

Gadinair a right to terminate the contract upon sale of the jet to a purchaser who did not wish to

participate in a JSSI program.  It is unclear, though, what right plaintiff thinks he obtains under

this section.  Presumably, plaintiff believes this section gives him some rights to the Account

Balance, but Section III(d) does not say the purchaser has any rights to the Account Balance.

Nor does it grant any approval to assign the contract to the new purchaser.

Instead, a subsequent provision sets out what happens to the Account Balance if the

purchaser does not wish to continue with the JSSI program.  Specifically,

> (j)      Credit Towards Replacement Aircraft.  *In the event (A) the Client
> sells the Aircraft and the Purchaser does not wish to enroll in the Program (as
> provided in Subsection III(d) above)*, or (B) this Contract is terminated because of
> damage or theft of the Aircraft (as provided in Subsection III(e) above), *the Client
> shall have the rights set forth in this Subsection III(j).  If the Client elects to enroll
> a Replacement Aircraft in the Program and enter into a new contract covering
> such replacement Aircraft, the Client shall be eligible to apply the amount of its
> Credit under this Contract, calculated as described in Exhibit A,* against either (1)
> the amount of the Pro Rata Elimination Fee, if any, due under the new contract for
> the Replacement Aircraft if the Replacement Aircraft is an In-Service Aircraft; or
> (2) the amount of monthly flight hour payments due under such new contract if
> the Replacement Aircraft is a New Aircraft.  The Client's rights under this
> Subsection III(j) shall expire in the event that the Client does not enter into a new
> contract for a Replacement Aircraft within thirty-six (36) months from the date of
> the termination of this Contract pursuant to either Subsection III(d) or (e), as
> applicable.

(2/27/2012 Maintenance Agreement at 12/Docket 1-3 at 16) (emphasis added).  (Note that the

2/27/2012 Maintenance Agreement defines Credit the same way it defines Account Balance.

(2/27/2012 Maintenance Agreement at Exh. A/Docket 1-3 at 23-24).)  Thus, in the event the

purchaser does not wish to continue in the JSSI Program (which plaintiff admits in his brief is

what happened here), the 2/27/2012 Maintenance Agreement does not give the Account Balance

to the purchaser.  Instead, it gives Gadinair a Credit (in the same amount as the Account

Balance) for any new aircraft it enrolls in JSSI within the following three years. Thus, JSSI did

not breach Section III(d) when it failed to provide plaintiff funds to overhaul the jet engines.

As a final effort, plaintiff alleges that he, as assignee, has rights under Section III(k) to a

rebate of 70% of the Account Balance. Section III(k) provides:

> (k)  Early Termination; Rebate of Account Balance. *In the event that (i)
> the Client is the first party to enroll the Engine(s) on a JSSI program*, (ii) the
> Client is in compliance with all terms and conditions of this Contract, including,
> but not limited to, payment of Minimum Service Charges, and (iii) *an off-wing
> event has not yet been performed on the Engine under this Contract, the Client
> shall have the right to terminate this Contract by delivering written notice thereof*
> to JSSI and the liability of the parties in further performance of this Contract shall
> be terminated effective as of the date of JSSI's receipt of such notice. In addition,
> *within ninety (90) days of the effective date of such termination notice, JSSI shall
> pay to the Client an amount equal to seventy percent (70%) of the Account
> Balance,* calculated as described in Exhibit A, as of the effective date of such
> termination.

(2/27/2012 Maintenance Agreement at 12-13/Docket 1-3 at 16-17).

The first problem with this argument is that it assumes that Gadinair assigned its rights in

the 2/27/2012 Maintenance Agreement to plaintiff and, accordingly, that plaintiff stands in the

shoes of Gadinair for purposes of enforcing Section III(k). As explained above, though, the

2/27/2012 Maintenance Agreement could only be assigned with JSSI's written consent, and

plaintiff has not alleged that JSSI consented in writing. The closest plaintiff comes to alleging

consent is to allege that "by accepting Exhibit "K" [the Notification Form] from Gadinair,

Defendant JSSI expressly or impliedly consented to the transfer of the remaining benefits of the

JSSI Maintenance Program." (Complt. ¶ 103). The Court cannot agree. The Notification Form

does not say it is a consent to an assignment. Rather, it states, "The terms of the Contract require

that the Customer provides written notice to JSSI." The Notification Form, thus, is the written

notice of a sale, not a written consent to an assignment. The Notification Form specifically

states, "This Notification does not amend or modify the Contract." The Court cannot agree that

17

JSSI consented to an assignment of the 2/27/2012 Maintenance Agreement merely by accepting the Notification Form.

The second problem is that, even if plaintiff had properly alleged JSSI consented to an assignment, plaintiff still has not alleged any of the conditions precedent to Section III(k). Plaintiff has not alleged he was the first party to enroll the engines in JSSI. Plaintiff has not alleged that he gave written notice to JSSI of his intent to terminate the contract. Plaintiff's allegations do not say whether an off-wing event had been performed under the contract. Plaintiff has not alleged that, until he gave written notice to JSSI of his intent to terminate the contract, he continued to pay the monthly fees on the account. Nor has plaintiff alleged that (1) Gadinair notified JSSI that it was terminating the contract and (2) Gadinair then assigned to plaintiff the right to collect under Section III(k).

Accordingly, plaintiff has not stated a claim for breach of contract. Count I is dismissed without prejudice. Plaintiff is granted 35 days in which to file an amended complaint if he can do so within the bounds of Rule 11.

**B.     Promissory estoppel**

In Count II, plaintiff asserts a claim for promissory estoppel. Plaintiff alleges that Lloyd told him "JSSI would pay for approximately 50% of the total cost to overhaul both engines on the Aircraft which meant that Plaintiff would be responsible for the remaining 50% if he chose to purchase the aircraft." (Complt. ¶ 37). Plaintiff alleges that at no time prior to plaintiff's closing on the purchase of the jet did JSSI tell him that he needed to sign a new five-year maintenance agreement with JSSI. Plaintiff alleges JSSI's conduct was meant to induce plaintiff into purchasing the jet.

18

The Illinois Supreme Court has explained that promissory estoppel "is a common-law doctrine adopted to permit the enforcement of promises that are unsupported by consideration, such as gratuitous promises, charitable subscriptions, and certain intrafamily promises." *Matthews v. Chicago Transit Authority*, 51 N.E.3d 753, 779 (Ill. 2016). It applies "only in the absence of an express agreement" and is "not designed to provide a party to a negotiated bargain a 'second bite at the apple' if it fails to prove breach of contract." *Matthews*, 51 N.E.3d at 779.

In order to state a claim for promissory estoppel, plaintiff must allege: "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendant, and (4) plaintiff relied on the promise to its detriment." *Matthews*, 51 N.E.3d at 780. "Plaintiff's reliance must be reasonable and justifiable." *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 310 (Ill. 1990).

Defendant points out problems with plaintiff's claim. For starters, plaintiff has not alleged a promise made by JSSI. Plaintiff has alleged a promise made by *Lloyd* with respect to JSSI. (Complt. ¶ 37) ("Lloyd reported to Plaintiff that Defendant JSSI would pay for approximately 50% of the total cost to overhaul both engines . . ."). Plaintiff has not alleged that Lloyd had the authority to speak on behalf of JSSI. To the contrary, plaintiff alleged (and, thus, admitted) Lloyd was *Gadinair's* agent for selling the jet. (Complt. ¶ 4, 10). Thus, it was not reasonable for plaintiff to rely on Lloyd's statement, and JSSI could not have expected plaintiff to so rely. *See Dougherty v. Akzo Nobel Salt, Inc.*, 47 F. Supp.2d 989, 991 (N.D. Ill. 1999) ("[Plaintiff's] reliance on the [alleged promise] was unreasonable because [the promissor] lacked authority to promise anything on [defendant's] behalf."); *Cora v. Rancilio Macchine Per Caffe S.p.A.*, Case No. 01 C 3613, 2003 WL 21654152 at *7 (N.D. Ill. July 14, 2003) (reliance not foreseeable or expected where speaker had no authority to make promise).

The other reason why plaintiff's alleged reliance could not be reasonable is that the alleged promise is not consistent with the 2/27/2012 Maintenance Agreement, which set out the circumstances under which a future purchaser could take advantage of the Account Balance. *See Ross v. May Co.*, 377 Ill.App.3d 387, 394 (1st Dist. 2007) (plaintiff failed to state claim for promissory estoppel where alleged promise was contrary to written employee handbook). Here, plaintiff not only alleged the existence of the 2/27/2012 Maintenance Agreement, he attached it to his complaint. Although plaintiff alleges that he did not actually see the 2/27/2012 Maintenance Agreement until *after* the sale closed, the reasonableness of reliance depends not just on what a plaintiff knew but on "what he could have discovered through the exercise of ordinary prudence." *Centro Medico Panamericano, Ltd. v. Benefits Mgt. Group, Inc.*, 61 N.E.3d 160, 168 (Ill.App.Ct. 1st Dist. 2016). The contract plaintiff signed with Gadinair for the purchase of the jet stated that "maintenance programs applicable to the Aircraft (including JSSI) that are *still in effect and that by their terms are assignable* shall be assigned to the Purchaser . . ." (Complt. Exh B. at 5/Docket 1-2 at 6) (emphasis added). Plaintiff alleges Lloyd gave him contact information for JSSI in the case he had questions (Complt. Exh. I), and plaintiff could have asked to see the 2/27/2012 Maintenance Agreement to determine whether it was still in effect and whether it was by its terms assignable. It was the prudent thing to do. That plaintiff did not do so is not the fault of JSSI. *Cf. Central States Joint Bd. v. Continental Assur. Co.*, 117 Ill.App.3d 600, 606 (1st Dist. 1983) ("A person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another.").

Plaintiff has failed to state a claim for promissory estoppel under Illinois law. Because plaintiff has alleged (and, thus, admitted) facts establishing that his reliance was not reasonable, the defect is not curable. Count II is dismissed with prejudice.

### C.        Unjust enrichment

In Count III, plaintiff asserts a claim for unjust enrichment.

To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 160 (Ill. 1989). In the usual case, a plaintiff seeks to recover a benefit he, himself, transferred to the defendant. In this case, however, plaintiff seeks to recover a benefit Gadinair transferred to JSSI, namely the Account Balance of the 2/27/2012 Maintenance Agreement, which (in simple terms) consisted of the monthly fees Gadinair had paid to JSSI under the 2/27/2012 Maintenance Agreement less the amount consumed by fees, taxes and maintenance expenses.

The Illinois Supreme Court has said that the retention of a benefit transferred to a defendant by a third party could be actionable as unjust where: "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefits from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than defendant." *HPI*, 131 Ill.2d at 161-62. Plaintiff does not argue that his claim falls into the first or second categories. (Nor could he. Gadinair did not pay JSSI under the contract by mistake, and the complaint contains no allegations suggesting Gadinair entered the 2/27/2012 Maintenance Agreement due to fraud.)

Instead, plaintiff argues he has a better claim than JSSI to the Account Balance. Plaintiff argues "it would be unjust to allow JSSI to retain the unused portions of the Trust Account that were clearly understood by all parties to "go with the Aircraft." (Docket 12 at 16). The Court

disagrees. The 2/27/2012 Maintenance Agreement into which Gadinair and JSSI willingly entered sets out what would happen to the Account Balance under various scenarios. In simple terms, the contract set out that: if the jet were irreparably damaged or stolen, Gadinair could use the Account Balance in connection with a new contract on a replacement aircraft (Section III(e)); if the jet were sold to an affiliate, the affiliate could take over the contract and the Account Balance (Section III(b)); if the jet were sold to a non-affiliate who wanted to sign a contract with JSSI, then the Account Balance would be the beginning balance for the new contract with the purchaser (Section III(c)); and, finally, if the jet were sold to a non-affiliate who chose not to participate in the JSSI program, then Gadinair could receive a Credit to be used toward a contract on a replacement aircraft purchased within three years (Section III(d)&(k)) or, perhaps, 70% of the Account Balance (Section III(k)). Thus, the mere fact that plaintiff chose not to enter a new contract with JSSI does not mean JSSI obtained a windfall. Instead, the 2/27/2012 Maintenance Agreement granted Gadinair certain rights with respect to the Account Balance. Only if Gadinair failed to sign a new contract for a replacement aircraft within three years (and if it could not take advantage of Section III(k)) would JSSI have unfettered access to the Account Balance. That is not unjust. It is not a windfall; it is the negotiated outcome of the 2/27/2012 Maintenance Agreement entered into between Gadinair and JSSI. In the face of the 2/27/2012 Maintenance Agreement, which plaintiff attached to his complaint, plaintiff cannot plausibly allege that he has a better claim to the Account Balance than JSSI. *See People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill.2d 473, 497 (Ill. 1992) (claim for unjust enrichment cannot lie where a contract governs).

Count III is dismissed with prejudice.

## IV.     CONCLUSION

For the reasons set forth above, the Court grants defendant's motion to dismiss [10].  The Court dismisses Count I without prejudice.  The Court dismisses Counts II and III with prejudice.  Plaintiff is granted 35 days in which to file an amended complaint.

**SO ORDERED.**                                              **ENTERED: June 28, 2019**

                                              _____
                                              **HON. JORGE ALONSO**
                                              **United States District Judge**